COPY

1

2 **MILSTEIN ADELMAN LLP**
Gillian L. Wade, State Bar No. 229124
3 gwade@milsteinadelman.com
Sara D. Avila, State Bar No. 263213
4 savila@milsteinadelman.com
M. Isaac Miller, State Bar No. 266459
5 imiller@milsteinadelman.com
2800 Donald Douglas Loop North
6 Santa Monica, California 90405
Telephone:   (310) 396-9600
7 Fax:           (310) 396-9635

8 **KANNER & WHITELEY, LLC**
Allan Kanner, Esq., State Bar No. 109152
9 a.kanner@kanner-law.com
Conlee Whiteley, Esq. (*pro hac* pending)
10 c.whiteley@kanner-law.com
Cynthia St.Amant, Esq. (*pro hac* pending)
11 c.stamant@kanner-law.com
701 Camp Street
12 New Orleans, Louisiana 7013
Tel: (504) 524-5777
13 Fax: (504) 524-5763

14 Attorneys for Plaintiff,
Erin Shaffer and the Proposed Class

15

16                    UNITED STATES DISTRICT COURT

17                    CENTRAL DISTRICT OF CALIFORNIA

18
ERIN SHAFFER, individually and on        )  CASE NO. **CV13-02363-CAS (JC)**
19 behalf of all others similarly situated,  )
                                          )  **CLASS ACTION COMPLAINT**
20                                          )
                     Plaintiff,            )  **1. VIOLATIONS OF CALIFORNIA**
21                                          )  **BUSINESS AND PROFESSIONS**
                                          )  **CODE § 16700,** *et seq.*, **THE**
22           vs.                           )  **CARTWRIGHT ACT**
                                          )
23                                          )  **2-4. VIOLATIONS OF**
SHIRE LLC, a Kentucky limited liability   )  **CALIFORNIA BUSINESS AND**
24 company; SHIRE U.S., INC., a New         )  **PROFESSIONS CODE § 17200,** *et*
Jersey corporation; and DOES 1 through    )  *seq.*
25 10 , inclusive,                          )
                                          )
26                                          )  **5. UNJUST ENRICHMENT**
                     Defendants.           )
27                                          )

28

Milstein & Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

FILED
CLERK, U.S. DISTRICT COURT

APR - 2 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                                DEPUTY

**CLASS ACTION COMPLAINT**

Plaintiff Erin Shaffer, individually and on behalf of all other similarly situated (the "Class"), brings this action against Defendants Shire LLC and Shire U.S., Inc. ("Shire U.S.") (collectively "Shire" or "Defendants"), and alleges, based on personal knowledge, investigation, and information and belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1.     This is a putative class action comprised of consumer indirect purchasers of Adderall XR ("AXR"), a popular prescription medication prescribed to treat attention deficit hyperactivity disorder ("ADHD").

2.     Defendants, Shire, are the manufacturer of brand-name AXR. Defendants sell AXR under the brand name Adderall XR and also sell it as an "Authorized Generic" to generic companies to sell as a generic product.

3.     Though other companies were able to bring an Authorized Generic to the market in 2009, Defendants engaged in a number of schemes meant to delay the entry of generic competition and then to restrict the supply of generic competition.  Namely, Defendants filed sham patent litigation, constructed anticompetitive reverse payment agreements with generic competitors, and even then proceeded to breach agreements to supply said competitors with materials to manufacture generic AXR, cutting off supply of cheaper-priced generic AXR to consumers.

4.     Defendants' conduct constitutes an illegal restraint of trade and/or attempt at monopolization in violation of both federal and state antitrust statutes, which harmed consumers by restricting supply of generic AXR and forcing many to purchase the far more expensive brand-name medication sold by Defendants.

5.     Plaintiff therefore brings this action on behalf of herself and a California Class of indirect purchasers of AXR, asserting that Defendants' anti-competitive behavior violates the Sherman Act, the Cartwright Act and the unfair and unlawful

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1

prongs of California Business & Professions Code section 17200.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  The aggregated claims of the individual class members exceed the sum value of $5,000,000, exclusive of interests and costs, and this is a class action in which more than two-thirds of the proposed plaintiff class, on the one hand, and Defendants, on the other, are citizens of different states.

7.     This Court has jurisdiction over Defendants because Defendants have sufficient minimum contacts in California, or otherwise intentionally avails themselves of the markets within California, through promotion, sale, marketing and distribution of AXR in California, to render the exercise of jurisdiction by this Court proper and necessary.  Moreover, Defendants can be brought before this Court pursuant to California's "long-arm" jurisdictional statute.

8.     Defendants transact business within this judicial district, and the interstate trade and commerce described herein is carried out, in substantial part, in this district.  Plaintiff and numerous Class Members reside in this district and purchased AXR and were thereby injured and subjected to irreparable harm in this district.  Defendants received substantial compensation and profits from sales of AXR in this district.  Thus, their liability arose in part in this district.  Venue is therefore appropriate under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

## PARTIES

9.     Plaintiff is, and at all times relevant hereto was, an individual residing in Los Angeles County, California.  Plaintiff purchased AXR in Los Angeles County for purposes other than resale.

10.     Defendant Shire U.S., Inc. is a New Jersey corporation with its principal place of business and headquarters at 725 Chesterbrook Blvd., Wayne, Pennsylvania 19087.  Throughout the Class Period, Shire U.S., Inc. marketed and sold AXR in

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

2

California and elsewhere.  Upon information and belief, Shire U.S., Inc. is the manufacturer and distributor of Adderall XR.  Further, upon information and belief, Shire U.S., Inc. maintains Shire's U.S. headquarters in Pennsylvania, and most of the wrongful conduct described herein emanated from Shire U.S., Inc.'s headquarters in Wayne, Pennsylvania.  Throughout the Class Period, Shire U.S., Inc. marketed and sold AXR in California and elsewhere.

11.    Defendant Shire LLC is a Kentucky limited liability company with its principal place of business at 9200 Brookfield Court, Florence, Kentucky 41042. Shire LLC is a successor entity to Shire Laboratories, Inc., a party to the anticompetitive reverse payment agreements at issue in this case.  Shire LLC develops, manufactures, and sells brand and generic pharmaceutical products in the United States, including AXR.  Throughout the Class Period, Shire LLC marketed and sold AXR in California and elsewhere.

12.    The true names and capacities, whether individual, corporate, associated or otherwise of certain manufacturers, distributors, or their alter egos sued herein as DOES 1 through 100 inclusive are presently unknown to Plaintiff who therefore sue these Defendants by fictitious names.  Plaintiff will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained.  Plaintiff is informed and believes and based thereon alleges that DOES 1 through 100 were authorized to do and did business in Los Angeles County.  Plaintiff is further informed and believes and based thereon alleges that DOES 1 through 100 were or are, in some manner or way, responsible for and liable to Plaintiff for the events, happenings, and damages hereinafter set forth below.

13.    Plaintiff is informed and believes and based thereon alleges that at all times relevant herein each of the Defendants was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in

3

doing the things herein complained of and alleged.

## FACTUAL ALLEGATIONS

### A.   Adderall XR, Shire, and Generic Competition

14.   AXR is a once-a-day psychostimulant drug of the pherethylamine and amphetamine chemical classes indicated for treatment of attention deficit hyperactivity disorder (ADHD).

15.   In 1996, Shire released Adderall in an instant release formulation.  It quickly became popular as an alternative to methylphenidate (sold under the brand name Ritalin) for treatment of ADHD.  Studies indicate that Adderall is slightly more potent and has a longer period of efficacy than Ritalin, especially at lower doses.

16.   In 2001, Shire introduced AXR, which added the additional convenience of once-a-day dosing.

17.   AXR quickly became a major source of revenue and the flagship product for Shire.  A small company founded in 1986, AXR transformed Shire into a major pharmaceutical company.  In the decade following AXR's release, Shire's net sales topped $6 billion.  AXR was a major source of Shire's sales, in 2008 alone accounting for over $1 billion in sales and nearly half of Shire's overall revenues.

18.   Other drug companies sought entry into the AXR markets.

19.   In November 2002, Barr Pharmaceuticals (which was acquired by Teva Phamaceuticals USA, Inc. and will subsequently be referred to as "Teva") filed an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA") to manufacture and sell a generic formulation of AXR it had developed.

20.   In September 2003, Impax Laboratories, Inc. ("Impax") filed an ANDA seeking to manufacture and sell its generic version of AXR.

### B.   Shire's Sham Patent Litigation

21.   In February 2003, Shire filed a patent suit against Teva, alleging

4

infringement of its '819 patent ("*Teva I*").  Shire filed a subsequent case against Teva in September 2003, alleging infringement of its '300 patent ("*Teva II*").  Both cases were filed in the Southern District of New York.

22.  Shire filed another patent suit against Impax in December 2003, alleging infringement of its '819 and '300 patents for 30 mg dosage ("*Impax I*").  Shire filed a subsequent case against Impax in January 2005, relating to additional dosage forms under the '819 and '300 patents ("*Impax II*").  Both cases were filed in the District of Delaware.

23.  Shire's litigation conduct further underscored its bad faith use of the '819 and '300 patent litigation to extend its monopoly.  For example, the Court in *Impax I* issued its Markman Order affecting claim construction of the '819 and '300 patents in February 2005.  Sensing defeat in light of the Court's order, Shire sought reconsideration, a motion that Impax correctly described in pleadings as yet another attempt to delay generic entry into the market.  The motion for reconsideration was denied.

24.  Meanwhile, in a further efforts to undermine the Court's ability in *Impax I* to resolve the patent disputes, in March 2005 (a month after and undoubtedly in response to the unfavorable ruling) Shire claimed that discovery in the Teva litigation uncovered supposed errors in both the '819 and '300 patents, and Shire requested a reissuance of the '819 and '300 patents pursuant to 35 U.S.C. §251.

25.  Yet when filing for re-issuance, Shire did not change any of the 42 claims asserted in those patents, but merely added additional claims.

26.  The result of the purported "curing" of errors however was to greatly delay and hamper the Court's ability to resolve the case in favor of the generic manufacturers on summary judgment.  Put plainly, Shire's '819 and '300 infringement claims were obvious sham claims filed merely to illegally extend its AXR monopoly.

27.  In October 2005, Shire filed another patent suit, this time against both

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Teva and Impax and alleging infringement of its '768 patent ("*Teva/Impax I*").  This case was filed in the Southern District of New York.

28.     Shire's '768 patent was not even listed in the FDA's Orange Book, so there was no question that there was no basis for a patent suit by Shire.  Under the Hatch-Waxman Act, a generic manufacturer has only infringed a patent if it is listed in the Orange Book; otherwise, generic manufacturers have a safe harbor in their preparation activities and there is no infringement until the generic manufacturer actually markets its product.

29.     Further, the release-mechanism technology covered by the '768 patent, upon information and belief, was not even employed by Shire in the AXR product.  Since the release mechanism covered by the '768 patent constituted a major change from those employed in AXR, it would not have even been possible (absent a bioequivalent test) for a product containing the '768 technology to be deemed bioequivalent to AXR.  Both in procedure and in substance, the '768 patent suit was a sham meant to illegally extend Shire's AXR monopoly.

30.     In the midst of its sham patent litigation, Shire's CEO Matt Emmens, in a remarkable moment of candor, described in a November 2005 interview his "tactics" for thwarting generic competition for AXR:

> The US is also where the lawyers are, and Mr. Emmens has had to spend a lot of time with them as Shire tries to defend its patents on Adderall, which most analysts forecast will face copycat competition after a courtroom showdown beginning in January.  If a copycat version is allowed on the market, Adderall prices will certainly collapse.  US parents, insurers and healthcare authorities might very much like that.  Mr. Emmens' task is to delay that until Shire's new products have established themselves.
>
> Pharmaceuticals companies expend a great deal of brainpower on tactics for maintaining their monopoly positions, and Shire is trying every tactic in the book. It is pretty pleased with itself to date. It has filed extra patents on the way Adderall is made and is

6

suing the generic drug makers for infringement of that and other patents. And it is asking regulators to insist that the generics firms conduct human trials before being allowed to launch. This last tactic is "pretty elegant", Mr. Emmens says with a smile.

He has experience of this sort of battle, having worked in the joint venture between Merck of the US and Astra of Sweden which developed Prilosec, an ulcer drug which became the world's best-selling medicine. AstraZeneca managed to tie up the manufacturers of generic Prilosec. In the courts for nearly two years after the core patents expired, thanks to a plan put in place many years before.

Stephen Foley, *Matt Emmens: Shire Pharmaceuticals chief focuses his attention on drugs deficit*, The Independent, Nov. 12, 2005.

31.    In March 2006, Shire filed a patent case against Teva (who had now merged with Barr), alleging (again) infringement of its '819 and '300 patents ("*Teva III*").  This time, Shire filed in the Eastern District of Pennsylvania.

32.    By filing suits alleging patent infringement, Shire was able to avail itself of various FDA regulations resulting in a 30-month automatic stay of FDA's approval of the Teva and Impax ANDAs.

33.    Upon information and belief, Shire's patent litigation was a sham, asserting a patent that is invalid, void or otherwise unenforceable, and Shire used the patent litigation to extend the time during which it maintained a monopoly knowing that its monopoly was in jeopardy.

34.    Shire's motivation is obvious.  Absent its sham litigation and dilatory litigation tactics, the patent litigation may have been resolved in favor of Teva or Impax before the conclusion of the 30-month stay, or the generic manufacturers might proceed to take the drug to market at conclusion of the stay "at risk" even while the patent lawsuits were pending.  Of course, the availability of a much cheaper generic would have profound implications for Shire's bottom line, likely causing it to lose ninety (90) percent of the market share for its blockbuster drug.

7

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

### C.    Shire's Reverse Payment Agreements with Teva and Impax

35.    In 2006 Shire settled its patent suits against both Teva and Impax. As part of the voluntary settlements, Shire made various payments to both Teva and Impax and the generic manufacturers agreed not to launch any generic AXR products until April (Teva) and October (Impax) of 2009.  Thus, Shire was able to extend its monopoly for three more years.

36.    At the time of the settlements, Shire faced the risk that had Teva and Impax been able to enter the market in 2006, Shire could potentially lose 90% of its Adderall XR sales, which at the time, were $731 million per year and 46% of Shire's annual business. Through the settlements Shire eliminated the threat from Teva and Impax for 3 years, thereby guaranteeing Shire's monopoly for that period of time. During this period, Adderall XR's sales climbed higher and higher, reaching $1.1 billion in 2008 alone.

37.    In return for Teva and Impax's agreement that they would not sell any competing generic products for three years, Shire agreed to provide Teva and Impax with patent licenses so that they could legally sell Shire's formulation of AXR as an Authorized Generic in 2009, in the event the FDA had not yet approved Teva's and Impax's ANDA's for their own generic AXR.  Shire would receive a royalty payment based on sales of its authorized generic AXR sold by Teva and/or Impax.  Thus, Shire retained complete control over the supply of AXR profiting from sales of the Brand and Authorized Generic product.

38.    Further, the agreement contained a requirement contract component, in that Shire agreed to meet Teva's and Impax's supply requirement and provide AXR directly to the two generic companies.  Because the FDA had not yet approved the Teva and Impax ANDAs in 2009, they would sell AXR manufactured by Shire as Authorized Generics.

39.    The only difference between brand-name and generic AXR would be the

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

trade dress and the price of each product.  Shire continued to sell the brand product at a substantially higher price than the Authorized Generic.  This further underscores the anticompetitive reasons that Shire was able to maintain such a large market share even though their product was much more expensive yet identical to that marketed by Teva and Impax.

40.     Upon information and belief, the three-year extension of Shire's monopoly imposed a substantial cost on consumers and conferred a benefit to Shire.  Through the settlement agreements, Shire provided consideration to Teva and Impax in exchange for their delay into the market.

41.     Upon information and belief, Shire engaged in numerous communications, and acts with Teva to reach its reverse payment agreement and acted in furtherance of this conspiracy to delay the introduction of generic AXR to the market, ultimately executing the reverse payment agreement.

42.     Upon information and belief, Shire engaged in numerous communications and acts with Impax to reach its reverse payment agreement and acted in furtherance of this conspiracy to delay the introduction of generic AXR to the market, ultimately executing the reverse payment agreement.

43.     Other generic manufacturers followed Teva and Impax by filing ANDAs for generic AXR, and Shire treated them in the same manner as it did Teva and Impax, by filing sham patent infringement litigation and then reaching settlements prior to any ruling on the validity of Shire's patents.

### D.     Shire's Intentional Breach of Supply Agreements

44.     Even after enjoying an extended monopoly over the market, on information and belief, Shire thereafter willfully breached its agreements with Teva and Impax by limiting the supply of the AXR product, such that Teva and Impax were unable to meet demand for the Authorized Generic.

45.     Shire refused to supply AXR to Teva in violation of the Shire-Teva

agreement.  Upon information and belief:

      a.    Teva introduced its generic AXR product in April 1, 2009 at prices below those charged for brand name AXR, and quickly acquired a majority (approximately sixty percent) of the AXR market.

      b.    As required by their agreement with Shire, Teva on or around July 1, 2009 sent Shire a 12-month forecast of the predicted supply of AXR Teva would need.  Along with that forecast was a purchase order (binding on Shire) for the months of October, November, and December 2009.

      c.    Shire, however, refused to honor the binding purchase order, and on or around August 28, 2009 notified Teva that it would not deliver the amount requested in the purchase order and would be delivering instead a much lower amount.

      d.    Then, on or around October 2, 2009, Shire notified Teva that it would not even be providing the much-lower amounts of AXR it had promised in August.  Meanwhile, Shire continued to provide the market with AXR to be sold under its brand-name (and more expensive) label.  In short, through its anti-competitive behavior, Shire forced consumers to purchase an identical product for a much higher price.

      e.    A few days later, on or around October 5, 2009, Shire employee Jeff Cooperrider told Teva employee Jeff Keyser that the reason behind Shire's failure to deliver the product to Teva was Shire's management's decision to keep the product for itself.

      f.    By failing to deliver the amount of AXR purchased in the July 2009 purchase order, Shire breached its agreement with Teva.  This breach continued via Shire's practice of restricting the supply from October 2009 on with the purpose and effect of hindering Teva's ability and incentive to compete in the AXR market.

46.    Shire also refused to supply AXR to Impax in violation of the Shire-Impax agreement.  Upon information and belief:

a.      Impax, whose AXR product was scheduled to debut on or around October 1, 2009, notified Shire in the months leading up to October of its intent to rely upon Shire to supply Impax's AXR product.  On information and belief, Impax timely submitted its purchase order for the amount needed for the initial launch, and continued to timely submit purchase orders thereafter based upon its forecasts.

b.      Starting in 2009, Shire failed to timely fill Impax's purchase orders.  Upon information and belief, the problem intensified in 2010 when Shire not only failed to timely deliver product, but in many instances delivered less than what was ordered or delivered none at all.  These repeated breaches of the agreement had the purpose and effect of hindering Impax's ability and incentive to compete in the AXR market.

c.      According to court documents filed by Impax, Shire's behavior had devastating effects.  As noted by the company:

> Impax consistently lacked sufficient supply of generic AXR. As a result of this lack of supply, Impax was unable to fill many of its customers' purchase orders. Impax also was forced to ration product to its customers or delay delivering product to its customers as a result of Shire's failure to supply. Impax's customers would have ordered more generic AXR if it were available. On several occasions, customers approached Impax seeking to purchase more generic AXR, but Impax had to turn them away before any purchase orders were placed because it had no stock available.
>
> …..
>
> As a result of Shire's failure to supply Impax with generic AXR, Impax lost sales to existing customers, lost the opportunity to execute more favorable contracts with its customers, and was unable to solicit additional customers.
>
> ….
>
> By starving Impax of supply, Shire ensured that Impax could not compete. Without sufficient supply Impax was unable to fill the orders of its customers, unable to provide those customers with additional product they wanted to buy, and unable to solicit new customers. Shire, on the other hand, has been able to

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

11

line its pockets with tens of millions of dollars every month from sales of branded AXR by refusing to fill Impax's orders and keeping supply for itself. Indeed, as a result of Shire's actions, more than two years after generic entry, Shire's branded AXR accounts for approximately 40% of the total AXR market.

47. Upon information and belief, had Shire met its obligation to supply AXR to Teva and Impax, the generic manufacturers would have captured roughly ninety (90) percent of the market. But in or around late 2009, Shire began improperly limiting the supply of AXR to the generic manufacturers, such that they were only able to capture little more than half of the market.

48. Thus, even though consumers faced much more expensive co-pays for brand name medication, upon information and belief Shire was able to maintain a forty (40) percent market share, which is unheard of following the availability of a cheaper, generic version of the drug.

49. By breaching the agreement, and ensuring that supply of generic AXR did not meet demand, Shire forced tens if not hundreds of thousands of consumers to expend significantly more money and purchase Shire's branded product.

50. Further, upon information and belief, with the supply of generic alternatives dwindling, Shire raised the price of brand name AXR while simultaneously eliminating discounts and rebates. Thus not only was Shire able to maintain its monopoly prices, but through its anticompetitive acts, it was able to raise them.

**E.** **The Supply Shortage and Monopoly Created by Defendants' Conduct**

51. Shire can offer no justification for its conduct, and the DEA has rejected the notion that the AXR shortage was due to the DEA's failure to set a manufacturing quota high enough to meet demand.

52. Upon information and belief, the AXR shortage was the result of Shire's management who created the shortage in order to increase the brand name market for the drug, as Shire controlled the supply for AXR—both brand name and generic.

12

53.     As evidence of Shire's anticompetitive effect, Shire in late 2010 was actually able to raise the price of AXR.  Even after raising the prices and increasing its own revenue, Shire still refused to reallocate the supply of AXR to Teva and Impax.  During this time Shire actually increased its self-allocation of AXR from forty (40) percent of the total AXR allocated to fifty (50) percent.  In this sense, Shire's breach of its supply agreements allowed it to charge artificially inflated prices.  Even while Shire raised its prices, it was able to increase its market share.

54.     As a result, Shire reported in the third quarter of 2010 that AXR sales had increased forty-one (41) percent to $99.7 million (for the quarter).  The sales numbers continued to climb, and in the first two quarters of 2011 Shire reported AXR sales of $111 million and $146.9 million.

### F.     Effect on Interstate Commerce, Market Power, and Competition

55.     At all relevant times, Defendants manufactured, sold, and shipped AXR across state lines including into California.

56.     At all relevant times, in connection with its sales of AXR, monies, contracts, bills, and business communications were transmitted continuously and uninterruptedly across state lines, including into California.

57.     At all relevant times, various devices were employed to commit the illegal acts described herein, including U.S. mail, interstate travel, interstate telephone communications, and interstate commerce.  Defendants' complained-of activities occurred within the stream of, and have substantially affected, interstate commerce.

58.     In this case, as alleged herein, there is direct proof of Defendants' monopoly power over the price of AXR.  This direct proof includes, but is not limited to: (a) Shire's exclusion of competition from the market by way of its agreements with Teva and Impax; (b) Shire's exclusion of competition from the market by way of Shire's refusal to honor the supply agreements with Teva and Impax; (c) Shire's unprecedented market share for AXR after generic drugs are introduced into the

marketplace; (d) Shire's status as the only supplier of AXR; (e) price data demonstrating Shire's ability to raise its prices without losing sufficient sales to render the price increases unprofitable; and/or (f) the lack of non-AXR drug products that can be reasonably substituted for AXR.

59.    The relevant product market is Adderall XR and its generic equivalents, in all forms and dosage strengths.

60.    The relevant geographic market is nationwide.  Through the illegal conduct described herein, Defendants were able to charge artificially high prices without losing substantial sales, and thus, by definition, maintained monopoly power over AXR products sold in the United States and California.

61.    Through the illegal conduct described herein, Defendants intentionally, purposefully, and successfully suppressed competition.  Defendants' exclusionary conduct suppressed the sale of AXR in the United States and California, and unlawfully enabled Defendants to sell AXR Product at artificially inflated prices.

62.    If Teva and Impax had effectively competed with Defendants, they would have captured a much greater share of the overall AXR market than Defendants, and Plaintiff and Class Members would have substituted more lower-priced AXR for the higher-priced brand name AXR .

63.    During the relevant time period, Plaintiff and Class Members purchased AXR indirectly from Defendants.  As a result of Defendants' anticompetitive and illegal conduct, Plaintiff and Class Members had to pay more money in the form of higher prices or co-pays for "brand name" medication even though it was precisely the same as the generic medication.  This is because Plaintiff and Class Members were deprived of the ability to purchase lower-priced generic AXR or Authorized Generic Adderall at competitive market prices.

64.    Thus Plaintiff and the Class Members, as a result of Defendants' illegal conduct, have suffered monetary losses and damages.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

### G.      Factual Allegations as to Named Plaintiff

65.     Plaintiff, Erin Shaffer, is a resident of Los Angeles County, California at all relevant times alleged in this lawsuit.

66.     Ms. Shaffer is an indirect purchaser of AXR and was prescribed AXR in or around 2009 and continues to take it through the present.

67.     Ms. Shaffer had purchased AXR through various insurance policies, Blue Shield, Anthem, Aetna and United Health Care.  Under these policies, Ms. Shaffer had to spend significantly more for brand name medication rather than if there was an FDA-approved generic

68.     Ms. Shaffer specifically sought less expensive generic AXR and was often told there was none available when she refilled her prescription at pharmacies in Los Angeles.

### CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action on behalf of herself and the proposed plaintiff Class members under Federal Rule of Civil Procedure Rule 23(b)(2) and (b)(3).  The proposed Class consists of:

> All persons residing in the State of California who purchased AXR for personal use and not for resale.

> Excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries and assigns. Also excluded from the Class are any judge, justice or judicial officer presiding over this matter.

Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

**FRCP 23(a) Factors**

70.   **Numerosity:** The Class comprises many thousands, if not millions of persons throughout California, the joinder of whom is impracticable, and the disposition of their claims in a Class Action will benefit the parties and the Court. The Class is sufficiently numerous because millions of units of AXR have been sold in the State of California during the Class Period.

71.   **Commonality:** There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented.  The questions of law and fact common to the Class predominate over questions which may affect individual class members.  Common questions of law and fact  include, but are not limited to, the following:

a.   Whether Shire's patent infringement lawsuits filed against Teva, Impax and others were filed with the improper purpose of preventing entry of competing generic products into the market, in violation of Section 2 of the Sherman Act;

b.   Whether Defendants' reverse payment agreements with generic manufacturers constitute the illegal restraint of trade in violation of Section 1 of the Sherman Act and/or the California Cartwright Act;

c.   Whether Defendants' reverse payment agreements with generic manufacturers constitute monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act and/or Cartwright Act;

d.   Whether Defendants' intentional breach of the supply agreements constitute monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act;

e.   Whether Defendants' violations of the Sherman Act constitutes an unlawful business act or practice within the meaning of Business &

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Professions Code § 17200, *et seq.*;

f.    Whether Defendants' violations of the Cartwright Act constitutes an unlawful business act or practice within the meaning of Business & Professions Code § 17200, *et seq.*;

g.    Whether Defendant's conduct constitutes an unfair business act or practice within the meaning of Business & Professions Code § 17200, *et seq.*;

h.    Whether Defendant's conduct constitutes a fraudulent practice within the meaning of Business & Professions Code § 17200, *et seq.*;

i.    Whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Defendants' power to exclude generic competition and set supracompetitive prices for AXR Product;

j.    If a relevant market needs to be defined, the definition of the relevant market for analyzing Defendants' monopoly power, and whether Defendants had monopoly power in the relevant market;

k.    Whether Plaintiff and the Class have been injured as a result of Defendants' anti-competitive conduct.

72.   **Typicality:** Plaintiff's claims, and the defenses thereto, are typical of the claims of the Class, and Plaintiff will fairly and adequately represent and protect the interests of the Class.  All members of the Class have the same or similar injury to their business or property (i.e. paying supra-competitive prices for AXR) as a result of Defendants' anti-competitive conduct.

73.   **Adequacy:** Plaintiff and her counsel will fairly and adequately represent the interests of the Class.  Plaintiff and her counsel have no conflicts of interest with and other members of the Class, and will vigorously prosecute the claims of the Class.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Plaintiff has retained competent and experienced counsel in class action litigation.

### FRCP 23(b)(2)

74.    Defendant acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole.  The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for Defendants.

75.    Injunctive relief is necessary to prevent further anti-competitive conduct by Defendants.  Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to engage in conduct which restrains, suppresses and/or eliminates competition in United States market for the sale of AXR.

### FRCP 23(b)(3)

76.    **Common issues predominate:** As set forth in detail above, common issues of fact and law predominate because all of Plaintiff's claims are based on identical anti-competitive conduct.

77.    **Superiority:** Additionally, a class action is superior to other available methods for fair and efficient adjudication of this controversy.  The expense and burden of individual litigation would make it impracticable or impossible for Class members to prosecute their claims individually. Absent a class action, Defendants will likely retain the benefits of their wrongdoing.  Because of the small size of the individual Class members' claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein.  Absent a representative action, the Class members will continue to suffer losses and Defendants will be allowed to continue these violations of law and to retain the proceeds of their ill-gotten gains.

78.    The trial and litigation of Plaintiff's claims are manageable.  Individual

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

18

litigation of the legal and factual issues raised by Defendants' conduct would increase delay and expense to all parties and the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale, and comprehensive supervision by a single court.

79.    **Notice to the Class:** Notice to the Class may be made by publication.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF CAL. BUS. & PROF. CODE § 16700 *ET SEQ.*, "THE CARTWRIGHT ACT"

(By Plaintiff and the Proposed Class Against Defendant)

80.    Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

81.    Defendants in combination with Teva and Impax, have restrained trade and prevented competition in, and monopolized the relevant market in violation of the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 & 16727.

82.    Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act, as defined in § 16720.

83.    Defendants' reverse payment agreements with Teva and Impax violated the Cartwright Act.

84.    Defendants possess monopoly power over the price of AXR, and over the relevant market – AXR and its generic equivalents – in the United States.  But for Defendants' anti-competitive practices, as set forth at length above, Defendants would not have been able to maintain its monopoly power over the price of AXR in the relevant market.

85.    During the relevant period, Defendants willfully and unlawfully maintained its monopoly power by excluding and impeding competition from the market for AXR.  The goal, purpose and/or effect of Defendants' scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors,

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

19

who would have sold generic versions in the United States at prices significantly below Defendants' prices for AXR, and therefore would have taken most of Defendants' market share.  Such generic competition would have effectively caused the average market price of AXR to decline dramatically.

86.     Defendants have no valid, legitimate business justification for its conduct.

87.      Defendants have created an unlawful trust which combines capital, skill and acts by two or more persons for the purposes of: (1) restricting trade and commerce; (2) limiting or reducing the production of a commodity; and (3) preventing competition in the manufacturing, making, and sale of a commodity.

88.     Defendants have conspired to create and acted in furtherance of this conspiracy by entering into contracts that restrict the right of a buyer to use the products of the competitor seller resulting in substantially less competition and has created a monopoly in commerce in the state of California.

89.     As a direct and proximate result of Defendant's anti-competitive and exclusionary conduct, competition, including price competition at the consumer level for AXR (through the emergence of generic alternatives) will continue to be restrained, suppressed or eliminated as a result of Defendants' anti-competitive conduct described herein.

90.     As a direct and proximate result of Defendants' anti-competitive and exclusionary conduct, competitors, actual and potential, have been, and will continue to be, restrained from vigorously competing with one another for selling AXR as a result of Defendants' anti-competitive conduct.

91.     As a direct and proximate result of Defendants' anti-competitive and exclusionary conduct, consumers, including Plaintiff and members of the putative Class, have been injured because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

absence of Defendants' anti-competitive conduct.  Plaintiff and the Class's injury is the kind of injury that the antitrust laws were intended to prevent, and flows from Defendant's unlawful conduct.

92.     As a result of Defendant's unlawful conduct, Plaintiff and the Class have sustained damages by paying supra-competitive prices that would not have been incurred but for Defendant's unlawful conduct as alleged in this Complaint, and is entitled to recover from Defendant the full consideration paid for AXR, treble damages, and equitable relief, under California Cartwright Act, Business and Professions Code § 16750(a) and 16761.

## SECOND CAUSE OF ACTION
## VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*
## (UNLAWFUL PRONG)

(By Plaintiff and the Proposed Class Against Defendant)

93.     Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

94.     California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in unlawful business acts and practices in violation of the UCL.

95.     Section 17200's prohibition of "unlawful" business acts or practices proscribes any business acts or practices that violate any law.  Virtually any law or regulation — federal, state, statutory or common law — can serve as a predicate for a §17200 unlawful prong violation.  Section 17200 "borrows" violations of other laws and treats them as unlawful acts or practices independently actionable under §17200.

96.     Here, Defendants' conduct violates the California Cartwright Act and the Sherman Act, and is thus unlawful under section 17200.

### *Defendants' Violation of the Cartwright Act*

97.     During the relevant period, Defendants willfully and unlawfully maintained its monopoly power by excluding and impeding competition from the

market for AXR.  The goal, purpose and/or effect of Defendants' scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions in the United States at prices significantly below Defendants' prices for AXR, and therefore would have taken most of Defendants' market share.  Such generic competition would have effectively caused the average market price of AXR to decline dramatically.

98.   Defendants have willfully acquired and/or maintained their monopoly power over the United States market for the sale of AXR, not through superior skill and/or product, business acumen, or enterprise, but rather through the foregoing anti-competitive and exclusionary conduct.

99.   Defendants have created an unlawful trust which combines capital, skill and acts by two or more persons for the purposes of: (1) restricting trade and commerce; (2) limiting or reducing the production of a commodity; and (3) preventing competition in the manufacturing, making, and sale of a commodity.

100.   Defendants have conspired to create and acted in furtherance of this conspiracy by entering into contracts that restrict the right of a buyer to use the products of the competitor seller resulting in substantially less competition and has created a monopoly in commerce in the state of California.

101.   As a direct and proximate result of Defendant's anti-competitive and exclusionary conduct, competition, including price competition at the consumer level for AXR (through the emergence of generic alternatives) will continue to be restrained, suppressed or eliminated as a result of Defendants' anti-competitive conduct described herein.

102.   As a direct and proximate result of Defendants' anti-competitive and exclusionary conduct, competitors, actual and potential, have been, and will continue to be, restrained from vigorously competing with one another for selling AXR as a result of Defendants' anti-competitive conduct.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

103.   As a direct and proximate result of Defendant's anti-competitive and exclusionary conduct, competition, including price competition at the consumer level for AXR (through the emergence of generic alternatives) will continue to be restrained, suppressed or eliminated as a result of Defendants' anti-competitive conduct described herein.

104.   As a direct and proximate result of Defendants' anti-competitive and exclusionary conduct, consumers, including Plaintiff and members of the putative Class, have been injured because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendants' anti-competitive conduct.  Plaintiff and the Class's injury is the kind of injury that the antitrust laws were intended to prevent, and flows from Defendant's unlawful conduct.

105.   There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Defendant's monopolization of the United States market for the sale of AXR.  Thus, Defendants acts violate the Cartwright Act, Cal. Bus. & Prof. Code §§ 16720 & 16727, and constitute unlawful acts or practices in violation of the unlawful prong of section 17200.

### Defendants' Violation of Section 1 of the Sherman Act

106.   Defendants have violated Section 1 of the Sherman Act, 15 U.S.C. §1, by engaging in the unlawful, anti-competitive conduct set forth herein.  Defendants have restrained trade and commerce in the relevant product market in violation of Section 1 of the Sherman Act. But for the anti-competitive practices Defendants would not have been able to maintain their monopoly power over the price of AXR in the relevant market.

107.   Defendant acted in concert with Teva, Impax, and other generic manufacturers in furtherance of the illegal restraint of trade complained of herein.

108.   Defendants' reverse payment settlements with Teva and Impax constitute

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

*per se* unreasonable restraints of trade.  Alternatively, the reverse payment settlements had an unreasonable adverse effect on competition in the properly defined relevant market.

109.   Shire's agreements with Teva and Impax were comprised of payments from Shire to Teva and Impax, who in turn agreed to delay entry into the market.  As such, this is an unreasonable restraint of trade.  The agreements were for no purpose other than delay the generic manufacturers' entry into the drug market and offered no pro-competitive benefits.

110.   Competition, including price competition at the consumer level for AXR (through the emergence of generic alternatives) will continue to be restrained, suppressed or eliminated as a result of Defendants' anti-competitive conduct described herein.  The actual adverse effects of these agreements include, but are not limited to:

    a.  Shire's control of the AXR and Authorized Generic market;

    b.  The delayed entry of generic competition into the AXR market;

    c.  A restraint on output of generic AXR; and/or

    d.  Higher prices for brand name AXR (due to shortage of generic competition).

111.   The agreements were further *per se* anti-competitive for these reasons.

112.   Here, the relevant market is AXR and its generic equivalents sold nationwide.

113.   Competitors, actual and potential, have been, and will continue to be, restrained from vigorously competing with one another for selling AXR as a result of Defendant's anti-competitive conduct.

114.   Indirect purchasers (including Plaintiff and members of the putative Class), have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR (or paid higher co-pays for brand name medications), which they otherwise would not have had to pay in the

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

absence of Defendants' anti-competitive conduct.  Plaintiff's and the Class's injuries flow from Defendants' unlawful conduct.

115.   Because of Defendants' violations of Section 1 of the Sherman Act, consumers (including Plaintiff and the Class) were deprived of a less expensive generic product, and were forced to purchase a more expensive brand name product. These are the types of injuries the Sherman Act seeks to prevent.

116.   As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act, Plaintiff and the Class have suffered a loss of money and suffered actual damages.

117.   There is no federal or state law which affirmatively authorizes Defendants to engage in the conduct alleged throughout this Complaint.

118.   Consumers, including Plaintiff and members of the putative Class, have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendant's anti-competitive conduct.  Plaintiff and the Class's injury is the kind of injury that the antitrust laws were intended to prevent, and flows from Defendant's unlawful conduct.

119.   There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Defendant's monopolization of the United States market for the sale of AXR.  Thus, Defendants acts violate the Sherman Act, and constitute unlawful acts or practices in violation of the unlawful prong of section 17200.

### *Defendants' Violation of Section 2 of the Sherman Act*

120.   Defendants violated Section 2 of the Sherman Act.  Defendants attempted to and successfully monopolized power over the price of AXR, and over the relevant market—AXR and its generic equivalents—nationwide and in the State of California.  But for Defendants' exclusionary, anti-competitive practices, as set forth

Milstein Adelman, LLP
2800 Douglas Loop North
Santa Monica, California 90405

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

at length above, Defendant would not have been able to maintain its monopoly power over the price of AXR in the relevant market.

121. Defendant violated Section 2 of the Sherman Act in three ways, and taken together further illustrate a successful attempt to exert an illegal monopoly of the price of ACT and over the relevant market. Defendants (1) engaged in sham patent litigation; (2) entered into reverse payment agreements; and (3) intentionally breached its supply agreements with Teva and Impax. All of these actions were done to restrict generic AXR output and furthered Defendants' monopolization of the AXR market, excluding generic manufacturers from participating.

122. During the relevant period, Defendants willfully and unlawfully maintained their monopoly power by excluding and impeding competition from the market for AXR. The goal, purpose and/or effect of Defendants' scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions nationwide and in California at prices significantly below Defendants' prices for AXR, and therefore would have taken most of Defendants' market share. Such generic competition would have effectively caused the average market price of AXR to decline dramatically.

123. Defendants have willfully acquired and/or maintained their monopoly power over the market for the sale of AXR, not through superior skill and/or product, business acumen, or enterprise, but rather through the foregoing anti-competitive and exclusionary conduct. Defendants' conduct in engaging in the sham patent litigation and/or intentionally breaching its supply agreements ran afoul of Section 2 of the Sherman Act.

124. Indirect purchasers (including Plaintiff and members of the putative Class), have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR (or paid higher co-pays for brand name medications), which they otherwise would not have had to pay in the

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

absence of Defendants' anti-competitive conduct.  Plaintiff's and the Class's injuries flow from Defendants' unlawful conduct.

125.   Because of Defendants' violations of Section 2 of the Sherman Act, consumers (including Plaintiff and the Class) were deprived of a less expensive generic product, and were forced to purchase a more expensive brand name product. These are the types of injuries the Sherman Act seeks to prevent.

126.   As a direct and proximate result of Defendants' violations of Section 2 of the Sherman Act, Plaintiff and the Class have suffered a loss of money and suffered actual damages.

127.   There is no federal or state law which affirmatively authorizes Defendants to engage in the conduct alleged throughout this Complaint.

128.   Consumers, including Plaintiff and members of the putative Class, have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendant's anti-competitive conduct.  Plaintiff and the Class's injury is the kind of injury that the antitrust laws were intended to prevent, and flows from Defendant's unlawful conduct.

129.   There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Defendant's monopolization of the United States market for the sale of AXR.  Thus, Defendants acts violate the Sherman Act, Cal., and constitute unlawful acts or practices in violation of the unlawful prong of section 17200.

130.   Pursuant to Business & Professions Code § 17203, Plaintiff and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of anticompetitive and monopolistic control over the AXR market.  Likewise, Plaintiff and the members of

the Class request an order awarding restitution of the money wrongfully acquired by Defendants.

### THIRD CAUSE OF ACTION
### VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ.*
### (UNFAIR PRONG)

(By Plaintiff and the Proposed Class Against Defendant)

131.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

132.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendants have engaged in unfair business acts and practices in violation of the UCL.

133.   Defendants possess monopoly power over the price of AXR, and over the relevant market – AXR and its generic equivalents – in the United States.  But for Defendants' anti-competitive practices, as set forth at length above, Defendants would not have been able to maintain its monopoly power over the price of AXR in the relevant market.

134.   During the relevant period, Defendants willfully and unlawfully maintained its monopoly power by excluding and impeding competition from the market for AXR.

135.   First, by utilizing sham patent litigation to delay the entry into the market of generic version of AXR, Defendants engaged in an unfair practice which caused Plaintiff and the Class to pay more for AXR than they would have but for this wrongful conduct.

136.   Second, by contriving with generic manufacturers to enter into reverse payment agreements, Defendants delay the entry into the market of generic version of AXR, and thus engaged in an unfair practice which caused Plaintiff and the Class to pay more for AXR than they would have but for this wrongful conduct.

137.   Third, by intentionally breaching the supply agreements with the generic

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

28

manufacturers, Defendants further artificially controlled the supply and cost of AXR, causing Plaintiff and the Class to pay more for AXR than they would have but for this wrongful conduct.

138.   The goal, purpose and/or effect of Defendants' scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions in the United States at prices significantly below Defendants' prices for AXR, and therefore would have taken most of Defendants' market share.  Such generic competition would have effectively caused the average market price of AXR to decline dramatically.

139.   Defendants have willfully acquired and/or maintained their monopoly power over the United States market for the sale of AXR, not through superior skill and/or product, business acumen, or enterprise, but rather through the foregoing anti-competitive and exclusionary conduct.

140.   There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Defendant's monopolization of the United States market for the sale of AXR.

141.   As alleged in the preceding paragraphs Defendants acts constitute "unfair" practices within the meaning of California Business & Professions Code § 17200.

142.   Defendants' business practices, as alleged herein, are unfair because: (1) the injury to the consumer is substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and (3) consumers could not avoid paying Defendants' monopolistic prices because there are no viable alternatives, and there were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

143.   Further, Defendants' conduct is unfair as it violates state and federal anti-trust laws and violates the policy and spirit of these anti-trust laws.  The effect of Defendants' wrongful conduct significantly threatens and harms competition.

144.   All of the conduct alleged herein occurs and continues to occur in Defendants' business.   Defendants' wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

145.   Consumers, including Plaintiff and members of the putative Class, have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendant's anti-competitive conduct.  Plaintiff and the Class's injury is the kind of injury that the antitrust laws were intended to prevent, and flows from Defendant's unlawful conduct.

146.   Pursuant to Business & Professions Code § 17203, Plaintiff and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of anticompetitive and monopolistic control over the AXR market.  Likewise, Plaintiff and the members of the Class request an order awarding restitution of the money wrongfully acquired by Defendants.

### FOURTH CAUSE OF ACTION
### VIOLATION OF CAL. BUS. & PROF. CODE § 17200 *ET SEQ*
### (FRAUDULENT PRONG)

(By Plaintiff and the Proposed Class Against Defendant)

147.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

148.   California Business and Professions Code section 17200 prohibits any "unlawful, unfair, or fraudulent business act or practices." Defendants have engaged in fraudulent business acts and practices in violation of the UCL.

149.   Defendants engaged in fraudulent conduct which is likely to deceive

members of the public in violation of California Business and Professions Code section 17200 when they (1) initiated baseless sham patent litigation and/or (2) falsely and publically claimed that they breached the supply agreements with Teva and Impax because the DEA failed to set a manufacturing quota high enough to meet demand. Defendants' sham patent litigation and false public statements furthered Defendants' illegal and wrongful monopolization of the AXR market.

150.   The goal, purpose and/or effect of Defendants' fraudulent scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions nationwide and in California at prices significantly below Defendants' prices for AXR.

151.   As a direct and proximate result of Defendants' deceptive conduct, Plaintiff and Class members were deprived of the opportunity to purchase a generic version of AXR, from July 1, 2009 to the present.

152.   Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive and fraudulent acts alleged in this Count.  The injury consists of paying higher prices for AXR prescription drugs than they would have paid in the absence of these violations.

153.   Pursuant to Business & Professions Code § 17203, Plaintiff and the members of the Class seek an order of this Court enjoining Defendants from continuing to engage, use, or employ their practice of anticompetitive and monopolistic control over the AXR market.  Likewise, Plaintiff and the members of the Class request an order awarding restitution of the money wrongfully acquired by Defendants.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT

154.   Plaintiff repeats and realleges the allegations set forth above, and incorporates the same as if set forth herein at length.

155.   Because of their wrongful acts, anti-competitive schemes and conduct,

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Defendants caused consumers, including Plaintiff and members of the putative Class, injury in their business and property because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendant's anti-competitive conduct, thus Defendants obtained monies which rightfully belong to Plaintiff and members of the class.

156.   Defendants enjoyed the benefit of increased financial gains, to the detriment of Plaintiff and other Class members.  It would be inequitable and unjust for Defendants to retain these wrongfully obtained profits.

157.   Plaintiff, therefore, seeks an order requiring Defendants to make restitution to her and other members of the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and on behalf of the members of the Class defined herein, prays for judgment and relief on all Causes of Action as follows:

A.   An order certifying that the action may be maintained as a Class Action;

B.   The acts alleged herein be adjudged and decreed to be an unlawful restraint of trade in violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*;

C.   That judgment be entered against Defendants, and each of them jointly and severally, for treble damages as a result of Defendants' violations of the Cartwright Act;

D.   An order enjoining Defendants from pursuing the policies, acts, and practices complained of herein;

E.   An order requiring Defendant to pay restitution to Plaintiff and all members of the Class;

F.   Actual damages;

G.   Punitive damages;

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

H.   For pre-judgment interest from the date of filing this suit;

I.   Reasonable attorneys' fees;

J.   Costs of this suit; and

K.   Such other and further relief as the Court may deem necessary or appropriate.

DATED: April 2, 2013                    Attorneys for Plaintiff,
                                        Erin Shaffer and the Proposed Class


By:  _____

     MILSTEIN ADELMAN, LLP
     Gillian L. Wade
     Sara D. Avila
     M. Isaac Miller


## **JURY TRIAL DEMANDED**

Plaintiff demands a jury trial on all triable issues.

DATED: April 2, 2013                    Attorneys for Plaintiff,
                                        Erin Shaffer and the Proposed Class


By:  _____

     MILSTEIN ADELMAN, LLP
     Gillian L. Wade
     Sara D. Avila
     M. Isaac Miller

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

33

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Christina A. Snyder and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV13- 2363 CAS  (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| **[ ] Western Division** | **[ ] Southern Division** | **[ ] Eastern Division** |
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

COPY

MILSTEIN ADELMAN, LLP
Gillian L. Wade, State Bar No. 229124
Sara D. Avila, State Bar No. 263213
M. Isaac Miller, State Bar No. 266459
2800 Donald Douglas Loop North
Santa Monica, California 90405

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERIN SHAFFER, individually and on behalf of all others similarly situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>SHIRE LLC, a Kentucky limited liability company; SHIRE U.S., INC., a New Jersey corporation; and DOES 1 through 10, inclusive,<br><br>DEFENDANT(S). | CASE NUMBER<br><br>CV13-02363-CAS(JCx)<br><br>SUMMONS |

TO:  DEFENDANT(S): SHIRE LLC, a Kentucky limited liability company; SHIRE U.S., INC.,
        a New Jersey corporation; and DOES 1 through 100, inclusive,

    A lawsuit has been filed against you.

        Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Gillian L. Wade_____, whose address is _2800 Donald Douglas Loop North, Santa Monica, California 90405_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

                                                    Clerk, U.S. District Court

Dated:  APR - 2 2013                  By: _____MARILYN DA____
                                                         Deputy Clerk

                                                    (Seal of the Court)

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)]._

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

COPY

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

ERIN SHAFFER, individually and on behalf of all others similarly situated,

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

SHIRE LLC, a Kentucky limited liability company; SHIRE U.S., INC., a New Jersey corporation; and DOES 1 through 10, inclusive,

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405
Telephone: (310) 396-9600

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff
☐ 2. U.S. Government Defendant
☐ 3. Federal Question (U.S. Government Not a Party)
☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding
☐ 2. Removed from State Court
☐ 3. Remanded from Appellate Court
☐ 4. Reinstated or Reopened
☐ 5. Transferred from Another District (Specify)
☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☒ Yes ☐ No   ☒ **MONEY DEMANDED IN COMPLAINT: $** TBD at Trial

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
VIOLATIONS OF CALIFORNIA BUSINESS AND PROFESSIONS CODE § 16700, et seq., THE CARTWRIGHT ACT

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpratice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:** Case Number: CV13-02363

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL COVER SHEET**

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Shire LLC- Kentucky<br>Shire U.S.- Pennsylvania |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | |

**\*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: _April 4, 2013_____

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability.  (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |